**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) |
| **Fairfield Sentry Ltd.,** *et al.,* | ) |
| | ) |
| Debtors in Foreign Proceedings. | ) |
| | ) |
| | ) |
| **Fairfield Sentry Ltd. (In** | ) |
| **Liquidation),** *et al.*, acting by and | ) |
| through the Foreign | ) |
| Representatives thereof, | ) |
| Plaintiffs, | ) |
| | ) |
| -against- | ) |
| | ) |
| **HSBC Private Bank Suisse S.A.,** *et al.*, | ) |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |

Chapter 15 Case

Case No. 10-13164 (CGM)

Adv. Pro. No. 10-03633 (CGM)

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
HSBC PRIVATE BANK (SUISSE) S.A.'S MOTION TO DISMISS FOR
LACK OF PERSONAL JURISDICTION UNDER RULE 12(B)(2)**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................... ii

UNDISPUTED FACTS ESTABLISHED IN DISCOVERY ............................................ 2

ARGUMENT ........................................................................... 7

I.    PBRS' Ministerial Subscriptions To The Funds Are Not Relevant
      U.S. Contacts ................................................................ 7

      A.    PBRS Did Not Purposefully Direct Its Conduct Toward
            The United States By Subscribing To The Funds Solely At
            The Direction And On Behalf Of Its Clients ............................ 8

      B.    PBRS' Redemptions of Shares In The Funds And
            Incidental Use Of U.S. Correspondent Accounts Do Not
            Satisfy The Minimum Contacts Test .................................... 14

II.   The Exercise Of Personal Jurisdiction Over PBRS Would Be
      Unreasonable................................................................ 18

III.  Plaintiffs' Claims For Sigma Redemptions Should Be Dismissed................ 20

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### <u>Cases</u>

*Abelesz v. OTP Bank*,
    692 F.3d 638 (7th Cir. 2012) ...............................................................................16

*Al Rushaid v. Pictet & Cie*,
    28 N.Y.3d 316 (2016) ...................................................................................16, 18

*American Estates Wines, Inc. v. Kreglinger Wine Estates Pty, Ltd., et al.*,
    2008 WL 819993 (D.N.J. Mar. 25, 2008)...........................................................14

*In re: Arcapita Bank B.S.C.(C)*,
    640 B.R. 604 (S.D.N.Y. 2022)............................................................................18

*Art Assure Ltd., LLC v. Artmentum GmbH*,
    2014 WL 5757545 (S.D.N.Y. Nov. 4, 2014) .........................................................7

*Asahi Metal Indus. Co. v. Superior Ct. of Ca.*,
    480 U.S. 102 (1987).............................................................................................19

*Averbach v. Cairo Amman Bank*,
    2022 WL 2530797 (S.D.N.Y. Apr. 11, 2022).....................................................18

*Bartlett v. Societe Generale de Banque Au Liban SAL*,
    2020 WL 7089448 (E.D.N.Y. Nov. 25, 2020).....................................................18

*In re: Bernard L. Madoff Inv. Sec., LLC*,
    708 F.3d 422 (2d Cir. 2013)..............................................................................4, 9

*Bristol-Myers Squibb Co. v. Superior Ct. of Ca.*,
    137 S. Ct. 1773 (2017)...................................................................................13, 20

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985)...............................................................................................1

*Daewoo Int'l (Am.) Corp. v. Orion Eng'g & Serv., Inc.*,
    2003 WL 22400198 (S.D.N.Y. Oct. 20, 2003) ...................................................16

*Dale v. Banque SCS All. S.A.*,
    2005 WL 2347853 (S.D.N.Y. Sept. 22, 2005).....................................................18

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*,
    722 F.3d 81 (2d Cir. 2013)....................................................................................7

**Page(s)**

*Fairfield Sentry Ltd. (In Liquidation) v. Citibank, N.A. London*,
2022 WL 4391023 (S.D.N.Y. Sept. 22, 2022)..........................................................................11

*Fairfield Sentry Ltd. (in Liquidation) v. Migani*
[2014] UKPC 9 .......................................................................................................................4, 11

*In re Fairfield Sentry Ltd. Litig.*,
458 B.R. 665 (S.D.N.Y. 2011)............................................................................................19, 20

*Fairfield Sentry Ltd. v. Citibank NA London*,
No. 19-cv-3911 (S.D.N.Y. July 21, 2021) (Dkt. 440) ...............................................................1

*Fin. One Pub. Co. v. Lehman Bros. Special Fin.*,
414 F.3d 325 (2d Cir. 2005)......................................................................................................11

*First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba*,
462 U.S. 611 (1983)...................................................................................................................19

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
141 S. Ct. 1017 (2021)...................................................................................................8, 13, 20

*Freeman v. HSBC Holdings PLC*,
2021 WL 76925 (E.D.N.Y. Jan. 7, 2021) .................................................................................18

*Ge Dandong v. Pinnacle Performance Ltd.*,
966 F. Supp. 2d 374 (S.D.N.Y. 2013).......................................................................................18

*Gucci Am., Inc. v. Weixing Li*,
135 F. Supp. 3d 87 (S.D.N.Y. 2015).........................................................................................18

*Hau Yin To v. HSBC Holdings, PLC*,
700 F. App'x 66 (2d Cir. 2017) ...........................................................................................11, 17

*J. McIntyre Mach., Ltd. v. Nicastro*,
564 U.S. 873 (2011)...................................................................................................................10

*J.L.B. Equities, Inc. v. Ocwen Fin. Corp.*,
131 F. Supp. 2d 544 (S.D.N.Y. 2001).........................................................................................9

*Jazini v. Nissan Motor Co.*,
148 F.3d 181 (2d Cir. 1998).........................................................................................................9

*Laydon v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*,
2017 WL 1113080 (S.D.N.Y. Mar. 10, 2017) ..........................................................................11

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
732 F.3d 161 (2d Cir. 2013)..........................................................................................14, 16, 18

-iii-

**Page(s)**

*Mashreqbank PSC v. Ahmed Hamad Al Gosaibi & Bros. Co.*,
  23 N.Y.3d 129 (2014) ...................................................................................16

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
  84 F.3d 560 (2d Cir. 1996)............................................................................19

*Miller v. Arab Bank, PLC*,
  372 F. Supp. 3d 33 (E.D.N.Y. 2019) .............................................................18

*Nike, Inc. v. Wu*,
  349 F. Supp. 3d 310 (S.D.N.Y. 2018)............................................................18

*Peterson v. Iran*,
  2013 WL 1155576 (S.D.N.Y. Mar. 13, 2013) ...............................................18

*Picard v. Bureau of Labor Insurance*,
  480 B.R. 501 (Bankr. S.D.N.Y. 2012) .............................................................8

*Porina v. Marward Shipping Co.*,
  2006 WL 2465819 (S.D.N.Y. Aug. 24, 2006) ...............................................19

*Schansman v. Sberbank*,
  565 F. Supp. 3d 405 (S.D.N.Y. 2021)............................................................18

*Scott v. Breeland*,
  792 F.2d 925 (9th Cir. 1986) .........................................................................14

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
  2021 WL 3477479 (Bankr. S.D.N.Y. Aug. 6, 2021) .......................................4

*In re Ski Train Fire in Kaprun, Austria*,
  342 F. Supp. 2d 207 (S.D.N.Y. 2004).............................................................9

*Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*,
  277 F. Supp. 3d 521 (S.D.N.Y. 2017).............................................................7

*Spetner v. Palestine Inv. Bank*,
  495 F. Supp. 3d 96 (E.D.N.Y. 2020) .............................................................14

*SPV OSUS Ltd. v. UBS AG*,
  114 F. Supp. 3d 161 (S.D.N.Y. 2015), *aff'd*, 882 F.3d 333 (2d Cir. 2018) ............................13

*Strauss v. Credit Lyonnais, S.A.*,
  175 F. Supp. 3d 3 (E.D.N.Y. 2016) ...........................................................18, 20

*In re Terrorist Attacks on Sept. 11, 2001*,
  714 F.3d 659 (2d Cir. 2013)............................................................................7

**Page(s)**

*In re Tether & Bitfinex Crypto Asset Litig.*,
  576 F. Supp. 3d 55 (S.D.N.Y. 2021) ................................................................................. 18

*U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*,
  916 F.3d 143 (2d Cir. 2019) ............................................................................................. 14

*Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*,
  751 F.2d 117 (2d Cir. 1984) ............................................................................................... 9

*Walden v. Fiore*,
  571 U.S. 277 (2014) ............................................................................................... 8, 10, 12

*Weiss v. Nat'l Westminster Bank PLC*,
  176 F. Supp. 3d 264 (E.D.N.Y. 2016) .............................................................................. 18

**Statutes**

Bankruptcy Code Section 550 ....................................................................................................... 4

Plaintiffs do not dispute that their claims, and the procedural posture of this Motion, are materially different from what the Court has previously addressed:

- Unlike the SIPA Trustee, Plaintiffs here sue on behalf of two BVI investment companies, asserting claims exclusively under BVI law related to the management of those companies premised on alleged breaches of fiduciary obligations by Citco Fund Services (Europe) B.V. in the Netherlands. Def.'s Opening Br. at 6-8, 10; *see also* Pls.'-Appellants' Opening Br. for Second-Round Appeal at 73, *Fairfield Sentry Ltd. v. Citibank NA London*, No. 19-cv-3911 (S.D.N.Y. July 21, 2021) (Dkt. 440) ("Pls.' Second-Round Appeal") (stating these claims are "…foreign law claims brought by foreign debtors to avoid foreign transfers between foreign entities…."); *Fairfield Sentry Ltd.*, 2021 WL 771677, at *3 (Bankr. S.D.N.Y. Feb. 23, 2021) (quoting BVI law elements of constructive trust claim).

- At Plaintiffs' insistence, this Motion has moved beyond mere allegations. HSBC Private Bank (Suisse) S.A. ("PBRS") has actively participated in a year of jurisdictional discovery – searching for and producing broad categories of documents, conducting custodial email searches, and providing sworn responses to interrogatories. Plaintiffs therefore have the burden of supporting jurisdiction through evidence.

When personal jurisdiction is disputed, "the constitutional touchstone remains whether the defendant purposefully established 'minimum contacts' in the forum ... such that he should reasonably anticipate being haled into court there." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985). Here, the evidentiary record unambiguously shows that PBRS could not have expected to have to answer *these* claims, brought by *these plaintiffs*, in this Court. The subscriptions and redemptions at issue here were made by PBRS acting exclusively as a non-discretionary, execution-only custodian of *client* investments in a BVI share offering that was not open to U.S. investors. The money that the Funds then invested with BLMIS was not PBRS' money, it was the *Funds'* money, as Plaintiffs admitted in discovery. Plaintiffs do not argue – nor could they – that the Funds lacked a separate legal personality from PBRS, or that PBRS (as a service provider to several, among many, Fund investors) dominated or controlled them. And the fact that the redemption payments were routed momentarily through the U.S. financial system –

like virtually every other U.S. dollar payment in the world – would not have caused PBRS to expect to be sued here.

To overcome these deficiencies, Plaintiffs try a sleight of hand: they conflate the Funds with BLMIS itself, pretending that PBRS invested in BLMIS in the U.S., when it did not. And then they seek to attribute to PBRS research reports on the Funds that were prepared and published by an entirely different company – *not* PBRS – asking the Court to treat that research (which had nothing to do with the investments at issue here) as if it were conducted by PBRS itself, without even a pretense of satisfying the Second Circuit's test for attributing the jurisdictional contacts of one company to another. Plaintiffs have failed to meet their burden to establish personal jurisdiction over PBRS, and their claims should be dismissed.

## <u>UNDISPUTED FACTS ESTABLISHED IN DISCOVERY</u>

The evidentiary record developed in discovery firmly supports PBRS' Motion[1]:

**(1)** ***PBRS is a Swiss bank that custodied non-discretionary, client investments in the Fairfield Funds.*** PBRS is a Swiss bank with its principal place of business and its place of incorporation both in Switzerland. Bamberger Decl. Ex. 8 (PBRS Supp. R&Os to Pls.' 1st Interrogatories) Nos. 3 & 4. It does not (and did not) conduct any business in the United States. *See* Bamberger Decl. Ex. 7 (PBRS' Amended Initial Disclosures) at 3-4. PBRS did not invest in New York-based BLMIS, but instead – in its role as a custodian bank – purchased shares of the BVI-based Funds on behalf of its clients. *See* Compl. ¶ 129; Hebler Supp. Decl. ¶ 5. Each and every relevant investment by PBRS in the Funds was made on an execution-only basis on behalf of a client who received no relevant investment advice from PBRS. Hebler Supp. Decl. ¶ 5;

---

[1]   Jurisdictional discovery was authorized after PBRS filed its opening brief. The Parties met and conferred and agreed, in lieu of PBRS seeking leave to file a new opening brief, that it could rely on the documentary record in this reply.

Burgio-Chiappa Decl. ¶ 15. That means that PBRS held *client* money as a custodian and purchased shares in the Funds for the benefit of its clients. *See* Hebler Decl. ¶¶ 5, 7. The Funds knew that PBRS was investing on behalf of clients, not itself. *See* Opp. Ex. 6 (FGG discussing email from PBRS to its clients invested in Fairfield funds).[2]

There is zero evidence that PBRS "deci[ded]" to "invest" in the Funds at all, much less with a view to ultimately placing money in the United States. *See* Opp. at 36-37.[3] Rather, as confirmed by sworn statements and records produced by PBRS months before Plaintiffs' briefing was due (and entirely ignored by them), PBRS' role was solely to execute its clients' instructions to purchase shares in the Funds. *See* Hebler Decl. ¶¶ 5, 7; Burgio-Chiappa Decl. ¶ 15. PBRS did not advise those investments to be made, and offered no recommendations to clients with respect to them. Hebler Decl. ¶¶ 5, 7; Burgio-Chiappa Decl. ¶ 15. To do so would have been against PBRS' policy at the time. Hebler Decl. ¶ 5(c); Burgio-Chiappa Decl. ¶ 12. PBRS exclusively complied with client instructions to purchase or sell shares in the Funds, and its role was simply to use the client's money to purchase those shares, and then to hold them for the client's benefit. *See* Compl. ¶ 129; Hebler Supp. Decl. ¶ 5. This is similar to how virtually all shares of all securities are held in the United States – in the name of the client's financial institution, not the client itself. Hebler Supp. Decl. ¶ 5; Bamberger Decl. Exs. 16-17.

While PBRS did receive the Private Placement Memoranda ("PPMs") in relation to subscriptions, *see* Opp. at 2-3, it did so only to obtain administrative details necessary to fulfill its administrative role as custodian. Hebler Supp. Decl. ¶ 7. PBRS neither cared nor had reason to care where the Funds were investing their money. *See* Burgio-Chiappa Decl. ¶¶ 7, 11, 13-14, 19.

---

[2]    Citations to "Opp. Ex." refer to the exhibits to the Declaration of Lena Konanova in Support of Liquidators' Opposition to HSBC Private Bank (Suisse) S.A.'s Mot. to Dismiss (Dkt. 212).
[3]    Citations to "Opp." refer to the Memorandum of Law in Support of Liquidators' Opposition to Defendant HSBC Private Bank (Suisse) S.A.'s Mot. to Dismiss (Dkt. 211).

Provided the investments were legal (which they obviously were), PBRS was obligated to execute its clients' investment instructions.  *See* Hebler Decl. ¶¶ 5, 7; Burgio-Chiappa Decl. ¶¶ 7, 11.

(2)  ***PBRS' "money" was not "channeled" to BLMIS.***  The money that PBRS transmitted to the Funds was not PBRS' money; it was client money held for the client's benefit. Hebler Supp. Decl. ¶ 5.  And the money that the Funds invested with BLMIS was – as Plaintiffs admit – the Funds' money, not that of their investors.  *See* Bamberger Decl. Ex. 9 (Pls.' R&Os to PBRS' 1st RFAs) No. 70.  The Funds are incorporated companies with their own legal personalities established in the BVI and are governed by BVI law in accordance with their Articles. Bamberger Decl. Ex. 9 (Pls.' R&Os to PBRS' 1st RFAs) Nos. 29-32, 84-87.  As explained by Simon Mortimore KC, a leading BVI law expert, in his declaration ("<u>Mortimore Decl.</u>"), purchase of the Funds' shares did not confer any ownership rights over the Funds' property.  *See* Mortimore Decl. ¶ 28 ("shareholder's ... rights [do] not include an interest in the company's property or business").  Thus, the Funds themselves, not their investors, were treated as "Customers" of BLMIS in its liquidation.  *See In re: Bernard L. Madoff Inv. Sec., LLC*, 708 F.3d 422, 427 (2d Cir. 2013) (finding that Fairfield investors "individually ... 'made no purchases, transacted no business, and had no dealings whatsoever' with BLMIS").[4]

(3)  ***The momentary transfer of funds through the U.S. banking system has nothing to do with Plaintiffs' claims.***  PBRS made its requests for redemptions by tendering shares to Citco Fund Services in the Netherlands, *see Fairfield Sentry Ltd. (in Liquidation) v. Migani* [2014]

---

[4]      Likewise, under this Court's prior rulings, the Funds themselves are treated as "Initial Transferees" for purposes of claims under Section 550 of the Bankruptcy Code.  *See Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 2021 WL 3477479 at *4 (Bankr. S.D.N.Y. Aug. 6, 2021).  Plaintiffs do not assert that the Funds' separate legal personality should be ignored, and there would be no basis to do so under BVI law.  Mortimore Decl. ¶ 9(5).

UKPC 9 ¶¶ 14-16 (appeal taken from BVI), and the redemptions were processed by Citco Fund Services abroad, Pls.' Second-Round Appeal at 24.[5]

Subscriptions for Fairfield Sentry were accepted in U.S. dollars. Bamberger Decl. Ex. 9 (Pls.' R&Os to PBRS' 1st RFAs) No. 42. Like virtually any other cross-border transfer of funds in U.S. dollars, subscribing required a momentary transfer of funds through the U.S. banking system. Expert Declaration of Vance S. Price ("Price Decl.") ¶¶ 6-14, 52-69. As a foreign bank without direct access to the U.S. payments system, PBRS used two correspondent accounts at its U.S. affiliate HSBC Bank USA, N.A. ("HBUS") (an entity distinct from PBRS with separate legal personality) to route payments for all U.S. dollar-denominated transactions, including the payments it received from Fairfield Sentry. Declaration of George Rajah in Support of HSBC Private Bank (Suisse) S.A.'s Motion to Dismiss for Lack of Personal Jurisdiction ¶¶ 4-6 (the "Rajah Decl.") ("According to HBUS's records, PBRS held two accounts at HBUS between 2004 and 2008.... Each of these accounts is a '*vostro*' account ... often also referred to as a 'correspondent account.'").[6] To the extent the payments transited through U.S.-based accounts during the course of that transaction, it was solely for the purpose of facilitating that transfer between two foreign parties in U.S. dollars under a foreign contract. *Id.* (affirming accounts were correspondent accounts to facilitate U.S. transfers). Such accounts are necessary to transact in U.S. dollars. Bamberger Decl. Ex. 15 (Garrido & Biber Decl.) ¶ 6; Price Decl. ¶¶ 6-14, 52-69. PBRS made no specific decision to route *these* payments through its accounts in the United States. Bamberger Decl. Ex. 15 (Garrido & Biber Decl.) ¶ 9 (use of U.S. correspondent accounts were

---

[5]     The Articles provided a contractual right under BVI law to redeem shares in the Funds at the Net Asset Value ("NAV") upon the tender of shares to the Fund's Dutch administrator, Citco Fund Services (Europe) B.V. ("Citco Fund Services" or the "Citco Administrator"). *See* Bamberger Decl. Ex. 9 (Pls.' R&Os to PBRS' 1st RFAs) Nos. 21-23, 54-56, 110-13.

[6]     Exhibit A to the Complaint alleges that PBRS received transfers from Sentry at HBUS. The only accounts that PBRS had at HBUS during the relevant time period were its two correspondent accounts. Rajah Decl. ¶ 4.

"in no way specific or tied to the redemption payments at issue in this litigation").

With respect to Fairfield Sigma, which was Euro-denominated, PBRS received the proceeds of redemptions in Frankfurt, Germany; they never entered the United States.  Compl. ¶ 38 & Ex. B; *see also* Bamberger Decl. Ex. 9 (Pls.' R&Os to PBRS' 1st RFAs) No. 10.

**(4)    *The "diligence" performed on the Fairfield Funds was not performed by PBRS.***

Plaintiffs annex a series of ongoing research reports on the Fairfield Funds to their Opposition, but as they acknowledge, none of those reports was produced by PBRS and none reflects any diligence actually done by PBRS.  *See* Opp. at 6-7.  Instead, the reports are from an entirely different entity – ███████████████████████████████████

██████████████████████ *See* Opp. Exs. 23-30.  Plaintiffs also exhibit ████████████████

█████████████████████████████████████████████████ Opp. Ex. 8.

████████████████████████████████████████████████████

██████████████████████ *see id.* § 1.5 ("██████████████████████

██████████████████████" (emphasis added)), and this is confirmed by a sworn declaration, Gascoigne Decl. ¶¶ 8-12.  PBRS simply purchased access to a database of research that ████ had compiled, including from meetings held by employees of HBUS (a U.S.-bank) with the Fairfield Funds in New York.  *See* Gascoigne Decl. ¶¶ 8-12.  Plaintiffs offer no *evidence* (as distinguished from inadmissible argument, contradicted by the facts) that these meetings or information gathering are jurisdictionally-relevant contacts *of PBRS*.

Plaintiffs do point to ███████████████████████████████████

████████████████████████████████████████ Opp. Exs. 4-5.  A███████████

████████████████████████████████████████████████████

██████████████████████████████ but Plaintiffs offer nothing to tie ████████████

███████████████████████████████████████████ to the non-discretionary, execution-

only investments at issue in this case.

(5)    ***PBRS and its clients did not receive a "massive profit."***  Finally, Plaintiffs frame

their argument in the falsehood that "PBRS was able to get out early and reap a massive profit for

itself and its clients." Opp. at 1.  Yet their own briefing confirms that PBRS' clients "██████

█████████████████████████████████████████████████████" Opp. at 2, and

received "$124 million in payments," *id.* at 1 – a *loss* of over ███████████

## ARGUMENT

Having obtained jurisdictional discovery, Plaintiffs must make at least a *prima facie*

showing of personal jurisdiction sufficient to defeat PBRS' motion.  *See Dorchester Fin. Sec., Inc.*

*v. Banco BRJ, S.A.*, 722 F.3d 81, 84-85, 87 (2d Cir. 2013).  That showing must be "factually

supported," *id.* at 85, and cannot rely on "argumentative inferences," "legal conclusion[s] couched

as a factual allegation," *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013),

or "conclusory statements without any supporting facts," *Art Assure Ltd., LLC v. Artmentum*

*GmbH*, 2014 WL 5757545, at *2 (S.D.N.Y. Nov. 4, 2014) (quoting *Jazini v. Nissan Motor Co.*,

148 F.3d 181, 185 (2d Cir. 1998)).  Personal jurisdiction is claim-specific, and the plaintiff must

show that the exercise of jurisdiction is constitutional with respect to "*each* claim asserted."

*Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 586 (S.D.N.Y.

2017) (quoting *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004)).

## I.    PBRS' Ministerial Subscriptions To The Funds Are Not Relevant U.S. Contacts

Plaintiffs must show that their claims arise out of PBRS' sufficient "minimum contacts

with the relevant forum."  *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d at 673 (internal

quotations omitted).  This inquiry "focuses on the relationship among the defendant, the forum,

and the litigation," which "must arise out of contacts that the defendant *himself* creates with the

forum," *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (internal quotations omitted), or "relate to the defendant's contacts with the forum," *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1025 (2021) (internal quotations omitted).  Plaintiffs fail to satisfy this inquiry.

### A. PBRS Did Not Purposefully Direct Its Conduct Toward The United States By Subscribing To The Funds Solely At The Direction And On Behalf Of Its Clients

This Court has found jurisdiction in cases where the Defendant was alleged to have deliberately and purposefully channeled money to BLMIS, with the Funds serving effectively as mere conduits for those transfers.  *See, e.g.*, Mem. Decision Denying Def.'s Mot. to Dismiss at 6-7, *Picard v. Banque SYZ & Co., SA*, Adv. Pro. No 11-02149 (CGM) (Bankr. S.D.N.Y., June 14, 2022) (Dkt. 167) ("*Banque Syz*"); *Picard v. Bureau of Labor Insurance*, 480 B.R. 501, 516-18 (Bankr. S.D.N.Y. 2012) (Lifland, J.) ("*BLI*").[7]  In each of those cases, the Court was focused on claims brought by the SIPC Trustee liquidating BLMIS in New York, and the Court credited allegations made without the benefit of discovery.

The facts of this case and its posture warrant a different outcome.  Here, the claims are brought on behalf of the Funds themselves, by their BVI court-appointed Liquidators.  Plaintiffs do not and could not assert that the Funds should be disregarded on these claims – they are before the Court appearing on behalf of the Funds.  *See* Compl. at 1 ("[Sentry] ... and [Sigma] ... by and through [Plaintiffs] ... allege the following....").  Indeed, Plaintiffs admit that the Funds are companies with identities separate and apart from their shareholders, and that any money invested with BLMIS therefore belonged to the Funds themselves and not to their investors.  Bamberger Decl. Ex. 9 (Pls.' R&OS to PBRS' 1st RFAs) Nos. 36, 39-40, 81-83.  As Mr. Mortimore's declaration makes clear, by purchasing shares in the Funds, PBRS did not "invest" in BLMIS; it

---

[7]       Following the Supreme Court's decision in *Walden*, PBRS is aware of no court, in any district, that has relied on the personal jurisdiction analysis of *BLI* or its progeny outside of the context of claims brought by the BLMIS Trustee.

acquired property – foreign securities – that were held entirely outside of the United States, and acquired no interest in or control over the assets of the Funds. Mortimore Decl. ¶¶ 20-32. The Second Circuit has expressly recognized as much, and that is why investors in the Funds were denied standing as customers of BLMIS under SIPA. *In re Bernard L. Madoff Inv. Sec. LLC*, 708 F.3d at 426-27 ("[t]he record shows that [] fund customers: '(1) had no direct financial relationship with BLMIS, (2) had no property interest in the assets that the Feeder Funds invested with BLMIS, (3) had no securities accounts with BLMIS, (4) lacked control over the [] Funds' investments with BLMIS, and (5) were not identified or otherwise reflected in BLMIS's books and records.'").

It is black letter law that a foreign company does not become subject to jurisdiction in the United States simply by acquiring stock in a company that engages in activities here. *Jazini*, 148 F.3d at 184 ("[T]he presence of the subsidiary alone does not establish the parent's presence in the state.").[8] Plaintiffs cite nothing to the contrary, and neither invoke nor seek to satisfy the Second Circuit's test for jurisdictional veil piercing. *See Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir. 1984). Instead, Plaintiffs try to cloak themselves in prior decisions that assumed – at the pre-evidentiary stage – that investors in the Funds intended that "their" money would "ultimately" end up in New York. *See* Opp. at 14-23. Plaintiffs assert that by purchasing shares of the Fairfield Funds, investors sought to "exploit the U.S. securities market." *Id.* at 5. Whether or not that is true of other investors, there is <u>zero</u> evidence that it is true of PBRS.

In fact, the <u>only</u> evidence conclusively demonstrates the opposite: with respect to the investments at issue here, PBRS acted solely as a non-discretionary, execution-only custodian.

---

[8]    *See also In re Ski Train Fire in Kaprun, Austria*, 342 F. Supp. 2d 207, 214-15 (S.D.N.Y. 2004) ("[E]ven a wholly owned subsidiary is presumed to be a separate entity in the absence of "clear evidence" that it is controlled by the parent."); *J.L.B. Equities, Inc. v. Ocwen Fin. Corp.*, 131 F. Supp. 2d 544, 549 (S.D.N.Y. 2001) ("The mere presence of a subsidiary in New York does not establish the parent's presence in the state.").

*See* Hebler Decl. ¶¶ 5, 7; Burgio-Chiappa Decl. ¶¶ 7, 11.[9]  That means that it took client money, funds that never belonged to PBRS and that were segregated from its own assets, acquired shares of the Funds upon its clients' instructions, and held those shares on its clients' behalf.  PBRS' interest was in fulfilling its clients' instructions to acquire shares of the Funds themselves.  *See* Hebler Decl. ¶¶ 5, 7; Burgio-Chiappa Decl. ¶¶ 7, 11.  Whether or not the Funds would use money raised in *foreign* capital markets to invest with BLMIS in the United States or for some other legal purpose was neither PBRS' concern nor its business.  *See* Burgio-Chiappa Decl. ¶¶ 7, 11-14, 19.[10]

Plaintiffs posit that when PBRS paid client money to purchase Fund shares, it must have known "that money" would be invested with BLMIS.  Opp. at 14.  That is both false and irrelevant.  It is false because the Funds were free to use money raised through sales of shares for any legal corporate purpose – such as paying redeeming shareholders.  Mortimore Decl. ¶¶ 33-36.  In fact, the Funds used subscription money to pay other investors.  *See* Bamberger Decl. Ex. 6 ¶ 42 ("The redemptions and subscriptions were typically netted out, so the bulk of the outflows from redemptions never had to be transferred out of [BLMIS].").  It is also irrelevant because even if PBRS knew the Funds would use the money raised through sales of shares to invest in the United States, the law is clear that the foreseeability of the *plaintiff's* contact with the forum is irrelevant.  *See, e.g.*, *Walden*¸ 571 U.S. at 289 (rejecting foreseeability of plaintiff's contact with the forum as basis for personal jurisdiction); *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 882 (2011) ("[I]t is not enough that [a] defendant might have predicted that its goods will reach the forum ....").

---

[9]     Plaintiffs alleged in their complaint that PBRS "solicited clients to invest in BLMIS feeder funds," Compl. ¶ 66, and that an investor placed $300,000 in Sentry based on PBRS' "recommendation," *id.* ¶ 70, but have identified no evidence to support either assertion, *see* Ex. 10 (Pls.' Resp. & Obj. to PBRS' 2nd RFPs) No. 4.
[10]     Sales of the Funds' shares also occurred solely abroad pursuant to SEC Regulation S, which permits sales of unregistered securities exclusively in the foreign markets and not to U.S. investors.  *See* Opp. Ex. 32 at 2 (█████ ██); Opp. Ex. 33 at 2 (████████████).

PBRS' agreement to litigate in New York under New York law issues related to the subscription agreement – presumably administrative disputes, given its limited role – could in no way have made foreseeable that it would be subject to suit here on BVI-law governed, intra-corporate claims relating to its clients' roles as Funds shareholders. *See Fin. One Pub. Co. v. Lehman Bros. Special Fin.*, 414 F.3d 325, 334 (2d Cir. 2005) (recognizing "a reluctance on the part of New York courts to construe contractual choice-of-law clauses broadly to encompass extra-contractual causes of action"). In any event, multiple courts in the U.S. and abroad have found that Plaintiffs' claims do not arise from the Subscription Agreements.[11]

Nor does the meeting or correspondence between PBRS and the Funds establish purposeful availment. Notably,  is not jurisdictionally-relevant. *See Hau Yin To v. HSBC Holdings, PLC*, 700 F. App'x 66, 67 (2d Cir. 2017) ("The communication and transmission of information to and from [BLMIS] in connection with fund administration and custodial duties do not give rise to personal jurisdiction."); *Laydon v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*, 2017 WL 1113080, at *3-4 (S.D.N.Y. Mar. 10, 2017) ("that electronic communications were routed through U.S.-wires or servers, or that recipients of those communications were located in the United States," was "insufficient to establish minimum contacts with the United States").

---

[11]        *See, e.g., Fairfield Sentry Ltd. (In Liquidation) v. Citibank, N.A. London*, 2022 WL 4391023, at *12 (S.D.N.Y. Sept. 22, 2022) ("I reject [Plaintiffs'] argument that their claims are 'with respect to the Subscription Agreement' because the Subscription Agreement was the 'basis of the contractual relationship' between the investors and the Funds."); *Fairfield Sentry Ltd. (in Liquidation) v. Migani* [2014] UKPC 9 ¶ 10 ("[W]hat matters is not the subscriber's acknowledgements, representations and warranties, nor the factual statements of the Fund, but the terms of the subscriber's membership of the Fund, which govern the redemption of its shares.").

The only ongoing diligence that Plaintiffs identified was not done by PBRS at all – it was done by an entirely different legal entity, ██████████████████████████████████ ██████████████████████████████████████  Plaintiffs' briefing acknowledges that these contacts are not PBRS', but rather contacts by non-PBRS employees employed by different legal entities in entirely different regions.  Opp. at 6-7 (citing Opp. Exs. 8, 21-30). Plaintiffs try to square the circle by pretending that "████████████████████████ ████████████████████████████████," *id.*, all in an effort to impute to PBRS jurisdictional contacts by other people and entities.  This is fiction, and Plaintiffs should know better:  they exhibited ████████████████████████████ that sets out very clearly the relationship between those two entities.[12] ██████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████ Opp. Ex. 8.  PBRS had no control over the research that ██████ did, nor ability to direct that ██████ research funds that it was not already covering.  Gascoigne Decl. ¶ 10.  All PBRS had was a right to access information that had already been compiled, which is what it did.  *Id.* at ¶¶ 9-11.  Receiving reports in Switzerland from a ██████ ██████████████ that reflects information that entity received from yet a third entity operating in ██████████ is not a jurisdictionally-relevant contact.  *See Walden*, 571 U.S. at 291 (the "unilateral activity of a third party ... cannot satisfy the requirement of contact with the forum State" (internal quotation omitted)).

With respect to Plaintiffs' Exhibit 7, ██████████████████████████████████

██████████████████████  Plaintiffs state with no basis whatsoever that "████████████████████████

---

[12]    Plaintiffs do not argue that ████████████████ were either agents of or alter egos of PBRS, nor could they do so.  ██████████████████████████████████████████████████████████
Bamberger Decl. Exs. 12-14.



" Opp. at 6.

██, Opp. Ex. 2, ██████ had nothing whatsoever to do with the non-discretionary, execution-only client investments at issue in this case, Hebler Decl. ¶¶ 5, 7, and even if it had, personal jurisdiction over claims concerning foreign transactions cannot be predicated on ████ ███████████████████, *Ford Motor Co.*, 141 S. Ct. at 1025 (contacts cannot be "random, isolated, or fortuitous") (internal quotations omitted).

Whatever the purpose of the diligence conducted by PBRS' affiliates, there is no evidence that it was conducted for the purpose of the investments at issue in this case – and, indeed, the only ████████████████████████████, was conducted at least four years before any investment in the Funds. *See supra* at 2-7. The only evidence after a year of discovery points to the diligence being conducted for entirely different purposes (e.g., deciding whether to recommend the Funds to clients), *see* Opp. Ex. 8, and plainly does not relate to Plaintiffs' claims, *Bristol-Myers Squibb Co. v. Superior Ct. of Ca.*, 137 S. Ct. 1773, 1780 (2017) ("When there is no such connection [between the forum and the underlying controversy], specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State."); *SPV OSUS Ltd. v. UBS AG*, 114 F. Supp. 3d 161, 170 (S.D.N.Y. 2015), *aff'd*, 882 F.3d 333 (2d Cir. 2018) (rejecting jurisdictional relevance of defendant's contacts with New York when the plaintiff had not relied on those contacts in deciding to invest in BLMIS). In any event, any

research that PBRS received about the Funds is irrelevant to *this* case, because *this* case only concerns investments on which PBRS provided *no advice*.

### B. PBRS' Redemptions of Shares In The Funds And Incidental Use Of U.S. Correspondent Accounts Do Not Satisfy The Minimum Contacts Test

In the world of international commerce, purely foreign transactions frequently have incidental connections to the United States. Foreigners routinely travel on U.S. airlines, change planes at U.S. airports,[13] send emails that transit U.S.-based servers,[14] and communicate over U.S.-based social media platforms. And when international transactions are conducted in the leading global reserve currency – the U.S. dollar – those transactions almost invariably involve transfers of funds that at some point or another touch the U.S. banking system. Price Decl. ¶¶ 6-14, 52-69. Courts have recognized that when the "principal wrong" in a legal case *is* the use of the U.S. banking system, the deliberate use itself may be an appropriate hook for specific personal jurisdiction. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170-71 (2d Cir. 2013) ("[A] lawsuit seeking redress for the allegedly unlawful provision of banking services."). But where the principal wrong is something else, and the momentary transfer of funds through the U.S. banking system is not the crux of the claim, courts uniformly recognize that the exercise of personal jurisdiction based on such a "random, fortuitous, or attenuated contact[]," *U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 150-51 (2d Cir. 2019), would be incompatible with due process, *see infra* at 18-20; *see also Spetner v. Palestine Inv. Bank*, 495 F. Supp. 3d 96, 116 (E.D.N.Y. 2020) (declining to exercise personal jurisdiction where defendant "did not exercise control over [intermediary bank's] selection and use of its correspondent accounts in New York,

---

[13]    Courts have recognized that doing so would not support personal jurisdiction. *See American Estates Wines, Inc. v. Kreglinger Wine Estates Pty, Ltd., et al.*, 2008 WL 819993, at *4 (D.N.J. Mar. 25, 2008); *Scott v. Breeland*, 792 F.2d 925, 927-28 (9th Cir. 1986).

[14]    70% of the world's internet traffic, for example, travels through servers in Northern Virginia. Bamberger Decl. Ex. 11.

or [intermediary bank's] decision to use correspondent accounts as opposed to another means of clearing and settling U.S. dollar transactions").

The U.S. dollar is the common currency of exchange in the global economy, accounting for more than 60% of international foreign currency claims and liabilities, Bamberger Decl. Ex. 2 at 6; *see also* Bamberger Decl. Exs. 1 and 5, and virtually all international commerce in dollars is conducted through a payment process that settles in the United States, Price Decl. ¶ 26.  A foreign party would not reasonably expect to be sued in the United States by another foreign party in relation to a foreign transaction merely because funds relevant to that transaction happened to route through a U.S. correspondent account.  *See* Bamberger Decl. Ex. 4 at *28 ("[T]he automated domestic clearance of dollar-denominated transactions in isolation does not in itself constitute a sufficient domestic nexus for recognizing a common-law claim.").  Plaintiffs argue and submit a declaration claiming that payments to or from Sentry could in theory have been accomplished without using the U.S. banking system.  Opp. at 9-10, 24-25 (citing Joyce Decl.).  But a closer examination shows that they largely reach that conclusion only by ignoring parts of the relevant transactions in their hypotheticals – assuming, for example, that payments could have been settled in Toronto, Canada, without accounting for how the funds in question would have been transferred back to PBRS and its clients in Switzerland (which would have required settlement through the U.S. banking system).  Price Decl. ¶¶ 6-14, 52-69.

More to the point, however, Plaintiffs assume – wrongly – that PBRS actually made a deliberate decision to clear these payments in a particular way.  But the only decision PBRS made was to be a foreign bank that permits its customers to transact in U.S. dollars.  That's it.  Indeed, the evidence shows that the transfer of funds here was unremarkable: money was routed from Sentry's bank in Europe (Citco) to PBRS in Switzerland, and because that money was U.S. dollars, it – like virtually every other significant dollar payment in the world – momentarily transited

-15-

through the U.S. banking system. *Id.* Finding jurisdiction over foreign transactions solely because the funds at issue momentarily transited the United States would effectively establish general jurisdiction in the United States for any global transaction that is conducted in U.S. dollars, which Courts have emphatically rejected.[15] *Abelesz v. OTP Bank*, 692 F.3d 638, 657-58 (7th Cir. 2012) ("[M]any courts have soundly rejected the suggestion that a correspondent banking relationship with a bank in the forum is sufficient to support general jurisdiction over a foreign defendant.") (citation omitted); *see also Mashreqbank PSC v. Ahmed Hamad Al Gosaibi & Bros. Co.*, 23 N.Y.3d 129, 137 (2014) ("Our state's interest in the integrity of its banks ... is not significantly threatened every time one foreign national ... moves dollars through a bank in New York.").

The question here is not whether PBRS could be sued for *anything* in relation to transfers through such an account. Had it provided "unlawful ... banking services," engaged in money laundering, terrorism financing, or some other act by which the U.S. transfer itself was the "principal wrong," it probably would be subject to jurisdiction here. *See Licci*, 732 F.3d at 170-71 (finding intentional use of a correspondent account to fund terrorist activities in violation of antiterrorism laws was "principal wrong"); *Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 338 (2016), (finding intentional use of a correspondent account to launder money and pay bribes were the relevant "wrongs"); *see infra* n.16-19. But no foreign bank should reasonably expect to be sued in New York on a client's foreign commercial disputes solely because it permitted foreign clients to access the global U.S. dollar payment system. *See Daewoo Int'l (Am.) Corp. v. Orion Eng'g & Serv., Inc.*, 2003 WL 22400198, at *2 (S.D.N.Y. Oct. 20, 2003) (no U.S. jurisdiction where foreign defendants used U.S. accounts to disperse a loan and collect interest payments pursuant to a

---

[15]     Plaintiffs' formulation of the rule would extend U.S. jurisdiction to almost any commercial dispute involving U.S. dollars. While Plaintiffs argue that, here, "PBRS' use of U.S. accounts is sufficiently related to the Liquidators' claims seeking to recover Sentry redemption payments," Opp. at 30, the payment or non-payment of funds is virtually always an element of a commercial claim – it does not necessarily follow that the claim itself arises out of or relates to the mechanism of payment.

contract negotiated abroad).

The Second Circuit's holding in *Hau Yin To* that PBRS' use of a correspondent account to facilitate investments with BLMIS was not a relevant jurisdictional contact is directly on point. 700 F. App'x at 66-67. Plaintiffs argue that *To* is distinguishable because the "defendants" were "not investors in any feeder fund." Opp. at 27. But that is irrelevant: the *plaintiff* in *To* was an investor in a feeder fund who argued, as Plaintiffs do here, that their money was "transmitted … to and from BLMIS" by foreign HSBC entities (including PBRS) and that their losses arose from those transfers. Bamberger Decl. Ex. 18. The Circuit rejected that argument, holding that by merely transferring money through a U.S. account PBRS had not "project[ed] [itself] into [the] state to engage in a sustained and substantial transaction of business." *To*, 700 F. App'x at 67.

The *Hau Yin To* reasoning controls the outcome here. Plaintiffs have made crystal clear that the money they are trying to recover is not in New York; ██████████████████████ ████████████████████████████████████████████████████████ *See, e.g.*, Opp. Ex. 38 (██████████████████████████). Their complaint is not that money was sent through the U.S. banking system. Their claim is that money from the Funds' accounts in Ireland ended up in an account at PBRS in Switzerland. As Plaintiffs represented to the District Court, "*every relevant component of the transactions at issue here occurred outside the territorial jurisdiction of the United States*." Pls.' Second-Round Appeal at 24. Indeed, Plaintiffs are currently litigating an appeal before the Second Circuit on the basis that the redemption payments at issue in this case are so "extraterritorial" that U.S. law cannot touch them. *See* Pls.' 2d Cir. Appeal at 73 (stating the claims are "... foreign law claims [brought] by foreign debtors to avoid foreign transfers between foreign entities ...").

Our research finds that *no* court in this Circuit has *ever* found that mere use of a U.S. correspondent account to momentarily facilitate otherwise lawful transfers of funds between

foreign parties, such as what PBRS did here, could subject a foreign party to U.S. personal

jurisdiction on a foreign law claim.  Rather, courts have looked to correspondent account use to

find jurisdiction in cases where the account use *itself* was the issue:  terrorism financing cases

against banks,[16] money laundering cases,[17] cases involving subpoenas for banking records,[18] and

cases in which accounts were used to facilitate a U.S. investment scheme.[19]  *In re: Arcapita Bank

B.S.C.(C)*, 640 B.R. 604 (S.D.N.Y. 2022) – which is currently on appeal – appears to be the only

exception.  But even there, the claims at issue involved use of a U.S. account to facilitate an

investment scheme in which the bank itself was a beneficial participant, and the claims at issue

were brought under U.S. law in connection with a U.S. bankruptcy.  These claims are different:

they are foreign law claims related to a client's controversy that is entirely foreign.  Unlike in *Licci*

or virtually any of the other cases at issue, no element of Plaintiffs' claims rely on use of a bank

account or the banking system, much less the U.S. banking system.  This is evidenced by the fact

that they assert the same claims with respect to Sigma transfers that never touched the United

States.  *See infra* at 20.  Indeed, Plaintiffs admit that they could have sued PBRS in the BVI but

chose not to do so because the BVI courts had effectively repudiated their claims.  *See* Opp. at 39;

Def.'s Opening Br. at 22-23.

## II.    The Exercise Of Personal Jurisdiction Over PBRS Would Be Unreasonable

For all of the reasons set out above, Plaintiffs cannot show that PBRS has sufficient

---

[16]    *Licci*, 732 F3d. 161; *Weiss v. Nat'l Westminster Bank PLC*, 176 F. Supp. 3d 264 (E.D.N.Y. 2016); *Peterson v. Iran*, 2013 WL 1155576 (S.D.N.Y. Mar. 13, 2013); *Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33 (E.D.N.Y. 2019); *Bartlett v. Societe Generale de Banque Au Liban SAL*, 2020 WL 7089448 (E.D.N.Y. Nov. 25, 2020); *Freeman v. HSBC Holdings PLC*, 2021 WL 76925 (E.D.N.Y. Jan. 7, 2021); *Schansman v. Sberbank*, 565 F. Supp. 3d 405 (S.D.N.Y. 2021); *Averbach v. Cairo Amman Bank*, 2022 WL 2530797 (S.D.N.Y. Apr. 11, 2022); *Strauss v. Credit Lyonnais, S.A.*, 175 F. Supp. 3d 3 (E.D.N.Y. 2016).
[17]    *Dale v. Banque SCS All. S.A.*, 2005 WL 2347853 (S.D.N.Y. Sept. 22, 2005); *Al Rushaid v. Pictet & Cie*, 68 N.E.3d 1 (2016).
[18]    *Gucci Am., Inc. v. Weixing Li*, 135 F. Supp. 3d 87 (S.D.N.Y. 2015); *Nike, Inc. v. Wu*, 349 F. Supp. 3d 310, 330 (S.D.N.Y. 2018).
[19]    *Ge Dandong v. Pinnacle Performance Ltd.*, 966 F. Supp. 2d 374 (S.D.N.Y. 2013); *In re Tether & Bitfinex Crypto Asset Litig.*, 576 F. Supp. 3d 55 (S.D.N.Y. 2021).

minimum contacts with the United States related to the BVI-law claim they are asserting for personal jurisdiction to be constitutional. Even if they were able to edge over the line, however, it is clear that the exercise of personal jurisdiction in this case would not be reasonable. *See Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 569 (2d Cir. 1996) ("[T]he reasonableness prong of the due process inquiry evokes a sliding scale:  the weaker the plaintiff's showing [on minimum contacts], the less a defendant need show in terms of unreasonableness to defeat jurisdiction."); *Porina v. Marward Shipping Co.*, 2006 WL 2465819, at *6 (S.D.N.Y. Aug. 24, 2006) ("[I]f a defendant's contacts with the United States are weak, the plaintiff has to make a stronger showing of reasonableness in order to show that jurisdiction over the defendant is proper."). In evaluating the reasonableness of exercising personal jurisdiction, "[a] court must consider the burden on defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief." *Asahi Metal Indus. Co. v. Superior Ct. of Ca.*, 480 U.S. 102, 113 (1987).

*First*, the interests of the United States in this dispute are, at best, minimal. This is an "ancillary" Chapter 15 case in which the Court is acting "to aid foreign jurisdictions in administering bankruptcies by preventing debtors from squirreling away assets in the United States." *In re Fairfield Sentry Ltd. Litig*., 458 B.R. 665, 686 (S.D.N.Y. 2011). "Here, there are no assets in the United States" and accordingly "the ancillary character of the Chapter 15 cases here is at a low ebb." *Id.* at 682. The dispute arises purely under foreign law, and is effectively an internal dispute between a BVI company and its shareholders, a situation in which the courts have long held the parties' reasonable expectations look to the state of incorporation to provide predictability. *See First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 621 (1983) (the internal affairs doctrine "achieves the need for certainty and predictability of result while generally protecting the justified expectations of parties with interests in the corporation"). None of the parties are domestic, and even the non-party, non-redeeming

-19-

shareholders of the Funds who might ultimately benefit from a recovery are, necessarily, foreign.[20]

*Second*, Plaintiffs have no reasonable interest in having this dispute adjudicated here. Unlike domestic plaintiffs, or trustees of U.S. bankruptcies, Plaintiffs have forum shopped their claims to New York due to a mistake of law on their part and adverse decisions in the courts where these claims should most naturally be heard: the BVI. Def.'s Opening Br. at 23. "The cases under the same legal theories could have been (and were) brought in the BVI proceedings." *In re Fairfield Sentry*, 458 B.R. at 686. Plaintiffs' attempt to distinguish *Ford Motor Co.*, 141 S. Ct. at 1031, and *Bristol-Myers*, 137 S. Ct. at 1773, is unavailing. Just like in *Bristol-Myers*, Plaintiffs are not U.S. residents, they did not send the redemptions at issue from the United States, and the *actual alleged injury upon which they have sued* did not occur in the United States.

*Third*, the burden on PBRS and its employees of litigating in this forum is significant. The witnesses and evidence in this action are all overseas, and merits discovery would probably expose PBRS to civil and criminal liability under foreign secrecy and privacy laws. *See* Bench Ruling Granting in Part and Den. in Part the Foreign Representatives Mot. Seeking Limited Relief (Dkt. 799-2) ("The various respondents have described ... the strong and undeniable interest of many nations in enforcing their banking secrecy laws.").

## III. Plaintiffs' Claims For Sigma Redemptions Should Be Dismissed

Plaintiffs' claims pertaining to transfers by Sigma fails for all the reasons set out above, and because those transfers did not touch the United States at all – it was transferred in Euros through Frankfurt, Germany. Bamberger Decl. Ex. 9 (Pls.' R&Os to PBRS' 1st RFAs) Nos. 10, 82, 107-09; Compl. ¶ 38 & Ex. B.

---

[20]    *See supra* n.10. Plaintiffs rely on *Strauss v. Credit Lyonnais, S.A.*, 175 F. Supp. 3d 3, 31 (E.D.N.Y. 2016) to attempt to articulate an interest of the United States, but the claims in that case were based on the U.S. Anti-Terrorism Act and alleged violations of U.S law. Here, Plaintiffs have expressly disclaimed that U.S. law even applies to the transfers at issue. *See* Appellants' Br. at 73, *In re: Fairfield Sentry Ltd.*, No. 22-2101 (2d Cir.) (Dkt. 227) (stating claims and transfers are foreign).

Dated: March 15, 2022
    New York, NY

        Respectfully submitted,

        CLEARY   GOTTLIEB   STEEN   &
        HAMILTON LLP

    By:  */s/ Nowell D. Bamberger*

        Jeffrey A. Rosenthal
        Joseph M. Kay
        David Z. Schwartz
        JD Colavecchio
        Thomas Q. Lynch
        One Liberty Plaza
        New York, NY 10006
        T: 212-225-2000
        F: 212-225-3999
        jrosenthal@cgsh.com
        jkay@cgsh.com
        dschwartz@cgsh.com
        jdcolavecchio@cgsh.com
        tlynch@cgsh.com

        Nowell D. Bamberger
        2112 Pennsylvania Avenue, N.W.
        Washington, D.C. 20037
        T: 202-974-1500
        F: 202-974-1999
        nbamberger@cgsh.com

        *Counsel for Defendant HSBC Private Bank
        (Suisse) S.A.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 15, 2023, I filed the foregoing document and

accompanying declarations and exhibits in unredacted form via USB to the Court and caused it

to be served electronically via email to the participants identified below:

David Elsberg
Maria Ginzburg
Jordan Goldstein
Lena Konanova
David S. Flugman
Joshua S. Margolin
SELENDY GAY ELSBERG PLLC
1290 Avenue of the Americas
New York, NY 10104
Telephone: 212-390-9000
delsberg@selendygay.com
mginzburg@selendygay.com
jgoldstein@selendygay.com
lkonanova@selendygay.com
dflugman@selendygay.com
jmargolin@selendygay.com

-and-

BROWN RUDNICK LLP
David J. Molton
Marek P. Krzyzowski
Seven Times Square
New York, NY 10036
Telephone: 212-209-4800
dmolton@brownrudnick.com
mkrzyzowski@brownrudnick.com

*Attorneys for the Plaintiffs Joint Liquidators*

 */s/ Nowell D. Bamberger*
Nowell D. Bamberger